## IN THE UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF KANSAS

| | |
|---|---|
| C.B., by his parents and next friends, HEATHER BAHNER and JEFF BAHNER, and HEATHER BAHNER and JEFF BAHNER in their individual capacities, <br><br> Plaintiffs, <br><br> v. <br><br> UNIFIED SCHOOL DISTRICT NO. 321, Pottawatomie County, State of Kansas, <br><br> and <br><br> SARAH SANDERS, in her individual capacity, <br><br> and, <br><br> TAYLOR HURLA, in her individual capacity, <br><br> and, <br><br> ALBERT BAHRET, in his individual capacity, <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) )     Case No. |

## COMPLAINT

Plaintiff, C.B., by his parents and next friends, Heather Bahner and Jeff Bahner, and Heather Bahner and Jeff Bahner in their individual capacities, allege as follows:

## Parties

1.   C.B. is a fifteen-year-old boy who lives with his mother and father in Silver Lake, Kansas. C.B. is a citizen of Kansas.

2.    Heather Bahner is C.B.'s mother and guardian.  Heather Bahner is an adult citizen of Kansas, residing in Silver Lake, Kansas.

3.    Jeff Bahner is C.B.'s father and guardian.  Jeff Bahner is an adult citizen of Kansas, residing in Silver Lake, Kansas.

4.    Defendant Unified School District No. 321, Pottawatomie County, State of Kansas (the "District"), is a public school district located in Pottawatomie County, Kansas, commonly referred to as the "Kaw Valley" school district, that may be sued in its name pursuant to K.S.A. § 72-1131.  The District can be served with process by and through the Board of Education Clerk, Kristy Dyche, 411 West Lasley Street, St. Marys, Kansas 66536.

5.    Defendant Sarah Sanders is a citizen of Kansas.  Ms. Sanders was an employee of the District at all times relevant hereto.  Ms. Sanders is an administrator, serving as the Director of Special Services with policymaking authority.  At all times relevant she was acting under the color of state law and within the scope of her employment.  Ms. Sanders supported and encouraged her subordinates to unlawfully restrain, seclude, and deprive C.B. of an equal opportunity to participate in or benefit from the District's educational programs.  Ms. Sanders can be served with process at 4325 NW Davis Road, Rossville, Kansas, 66533.

6.    Defendant Taylor Hurla is a citizen of Kansas.  Ms. Hurla was an employee of the District at all times relevant hereto. Ms. Hurla is a special education teacher.  At all times relevant she was acting under the color of state law and within the scope of her employment.  Ms. Hurla supported and encouraged her subordinate to unlawfully restrain, seclude, and deprive C.B. of an opportunity to participate in or benefit from the District's educational programs.  Ms. Hurla can be served with process at 21753 Homestead Road, Paxico, Kansas, 66526.

7.     Defendant Albert Bahret is a citizen of Kansas.  Mr. Bahret was an employee of the District at all relevant times described herein, acting under the color of state law and within the scope of his employment.  Mr. Bahret is a paraprofessional.  Mr. Bahret unlawfully restrained, secluded, and deprived C.B. of an opportunity to participate in or benefit from the District's educational programs.  Mr. Bahret can be served with process at 83 254th Road, Havensville, Kansas 66432.

## Jurisdiction and Venue

8.     This Court has personal jurisdiction over defendants because they are citizens of Kansas.

9.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331.

10.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(1), (b)(2).

## Freedom From Unsafe Restraints and Seclusions

11.     Kansas promulgated the Freedom from Unsafe Restraint and Seclusion Act to protect Kansas students from unlawful and unnecessary restraint and seclusion by school personnel.

12.     Among other things, the Act limits District personnel from employing *emergency safety interventions* to narrow circumstances where the "student presents a reasonable and immediate danger of physical harm to such student or others with the present ability to effect such physical harm."  K.S.A. § 72-6153(a).

13.     An Emergency Safety Intervention ("ESI") "means the use of seclusion or physical restraint, but does not include the use of time-out."  K.S.A. § 72-6152(g).

14.     In turn, the term "Seclusion" "means placement of a student in a location where all of the following conditions are met:

a) The student is placed in an enclosed area by school personnel;

b) The student is purposefully isolated from adults and peers; and

c) The student is prevented from leaving, or the student reasonably believes that such student will be prevented from leaving, the enclosed area." K.S.A. § 72-6152(t)

15.     Among other things, seclusion rooms must be of similar proportion and characteristics to classrooms, free from danger and sufficiently lighted. K.S.A. 72-6153(d).

16.     The term "Physical restraint" "means bodily force used to substantially limit a student's movement, except that consensual, solicited or unintentional contact and contact to provide comfort, assistance or instruction shall not be deemed to be physical restraint." K.S.A. 72-6152(p).

17.     Use of physical restraints that obstruct a student's airway are prohibited. K.S.A. 72-6153(f).

18.     Prior to employing any ESI, including seclusions, District personnel must first consider less restrictive alternatives, such as positive behavior interventions, and deem them inappropriate or ineffective. K.S.A. 72-6153(a).

19.     The use of ESI is to cease as soon as the immediate danger of physical harm ceases to exist. *Id.*

20.     The District possessed a mandatory policy regarding ESI, which states in part:

> All staff members shall be trained regarding the use of positive behavioral intervention strategies, de-escalation techniques, and prevention techniques. Such training shall be consistent with nationally recognized training programs on ESI. The intensity of the training provided will depend upon the employee's position. Administrators, licensed staff members, and other staff deemed most likely to need to restrain a student will be provided more intense training than staff who do not work directly with students in the classroom. District and building administration shall

4

make the determination of the intensity of training required by each position.

21.     Pursuant to Kansas law and District written policies, District staff are required to document each use of ESI describing the date and time, type of ESI, length of time the ESI was used, school personnel involved, and whether the student had a section 504 plan, an Individualized Education Program, and/or a behavior intervention plan.

22.     Further, the District possessed a mandatory policy regarding ESI, which states: "At least once per school year, each building principal or designees shall review the documentation of ESI incidents with appropriate staff members to consider the appropriateness of the use of ESI in those instances."

23.     Each school building maintains documentation regarding such training and a list of participants.

24.     The principal or designee is required to notify the parent the same day as an ESI incident.  Documentation of the ESI must be provided to the parents no later than the school day following the day of the ESI incident, including the following information: (A) The events leading up to the incident; (B) student behaviors that necessitated the ESI; (C) the date and time the incident occurred, the type of ESI used, the duration of the ESI, and the school personnel who used or supervised the ESI.

**C.B.'s Disabilities**

25.     C.B. is a child with a disability.  C.B. qualified for and receives special education from the District under the category of intellectual disability.  Further, C.B. is an "individual with a disability" under Section 504 and the ADA.  C.B. has been diagnosed with Down Syndrome, Dysphagia, Attention Deficit Hyperactive Disorder, developmental delay, speech delay, and Atrial Septal Defect, among other diagnoses (collectively, C.B.'s "Disabilities").  C.B.'s

Disabilities constitute mental and physical impairments that substantially limit C.B.'s major life activities, including but not limited to learning, reading, concentrating, thinking, communicating, and digestive, neurological, and brain functions. There are records of such impairments contained within the educational records.

26.    C.B. is partially nonverbal because of his Disabilities.  When he does speak, he typically will speak in short, abbreviated sentences.

27.    At all pertinent times, C.B. had physical or mental impairments that limit one or more major life activities, and he was capable of performing the essential functions of his particular school programs with reasonable accommodation.

28.    At various times, District evaluators administered assessments and reached findings evidencing the nature of C.B.'s Disabilities, including deficits in the areas of reading, math, writing, and speech which required special education goals and services.

29.    District evaluators also administered assessments and reached findings evidencing the nature of C.B.'s Disabilities as it related to minor maladaptive behaviors, such as refusing to follow directions.

30.    Thus, defendants were aware of C.B.'s Disabilities and their effect on C.B., including that atypical behaviors manifest from his disabilities.

### Defendants' Unlawful Treatment of C.B.

31.    C.B. attended St. Marys Jr./Sr. High School during his 2022-2023, 2023-2024 school years, and is enrolled to attend during his upcoming 2024-2025 school year.

32.    St. Marys Jr./Sr. High School is part of the District.

33.    Mr. Bahret was assigned to assist C.B. with his educational needs, as a paraprofessional.

34.     Ms. Hurla was and is C.B.'s special education teacher and Mr. Bahret's supervisor.

35.     Ms. Sanders supervises both Ms. Hurla and Mr. Bahret, in her capacity as the Director of Special Services.

36.     Defendants at St. Marys Jr./Sr. High School secluded C.B. in a small, dark utility closet on more than one occasion (the "Seclusion Closet").

37.     The Seclusion Closet was not designed or intended to be used to place students for any reason.  Yet Mr. Bahret angrily pulled and shoved C.B. into it on more than one occasion.

38.     On at least one occasion, Mr. Bahret entered the Seclusion Closet with C.B. and struck C.B. in the neck and/or face.  After exiting the Seclusion Closet, C.B. complained "Bert," "hit," "closet."

39.     Mr. Bahret aggressively pulled C.B. by his shirt collar and arms when removing him from the classroom to take him to the Seclusion Closet or elsewhere in the building.   Mr. Bahret was seen pulling and yanking C.B. with such force that C.B.'s shirt collar became tightened and obstructed C.B.'s airway.  C.B. choked, coughed, gasped for air, and begged Mr. Bahret to stop, but Mr. Bahret did not relent.

40.     Defendants adopted and stated the policy that such discriminatory treatment of C.B. was "how you have to handle him" and it was just "tough love."

41.     Mr. Bahret yelled derogatory words within inches of C.B.'s face on a daily basis.

42.     Mr. Bahret pulled and yanked C.B. by the shirt collar around the school building, at least one time per week.

43.     Mr. Bahret even placed C.B. in a locked cage used to store athletic equipment.

44.    But Mr. Bahret did not stop there.  Mr. Bahret photographed C.B. and distributed the photograph to District staff persons, analogizing C.B. to an animal and making light of his serious, demeaning and discriminatory conduct.

45.    A true and accurate copy of Mr. Bahret's photograph of C.B. in the District cage is set forth below, redacted to protect C.B.'s identity in this public filing:



46.    C.B. was locked in the cage for an indeterminate amount of time.  Mr. Bahret did not have a key to the cage, and had to enlist assistance from other District staff to open it and release C.B.

47.    C.B.'s placement in the Seclusion Closet and/or the cage were for no behaviors whatsoever, or for minor behaviors manifesting from his Disabilities that came nowhere close to constituting "a reasonable and immediate danger of physical harm to such student or others with the present ability to effect such physical harm."

48.    Taylor Hurla, the special education teacher in charge of C.B.'s classroom, was responsible for supervising Mr. Bahret as her subordinate.  Ms. Hurla witnessed Mr. Bahret's conduct towards C.B., received concerns from other District staff regarding the same, refused to intervene to stop it, and ratified the conduct.

### Defendants' Cover-Up & Continued Unlawful Treatment of C.B.

49.    Ms. Hurla actively participated in defendants' campaign to hide the unlawful conduct from C.B.'s parents.  When Heather Bahner recognized C.B. was suffering stress and anxiety upon returning home from school, she asked Ms. Hurla if C.B. was having negative experiences at school.  Ms. Hurla intentionally did not disclose Mr. Bahret's treatment of C.B. to Heather.  Ms. Hurla described C.B.'s school experiences positively, which could not be further from the truth.

50.    Sarah Sanders, the special education director in charge of the District's special education teachers and staff, was responsible for supervising Ms. Hurla and Mr. Bahret as her subordinates.  Ms. Sanders witnessed Mr. Bahret's conduct towards C.B., received concerns

from other District staff regarding the same, refused to intervene to stop it, and ratified the conduct.

51.   Ms. Sanders also actively participated in defendants' campaign to hide the unlawful conduct from C.B.'s parents.  Ms. Sanders promptly squashed staff complaints of Mr. Bahret's treatment of C.B.

52.   Rather than investigating and ceasing the unlawful conduct, Ms. Sanders instructed her subordinates to adopt a policy that "what happens in the classroom stays in the classroom."

53.   Ms. Sanders instructed her subordinates not to report the abuse to the Kansas Department of Children and Families, even going so far as to tell at least one District employee that he/she was not a mandated reporter as it pertained to C.B.'s treatment.

54.   Ms. Sanders' instruction that the District employee was not a mandated reporter as it pertained to C.B.'s treatment was untrue.

55.   C.B.'s maladaptive behaviors are minor, and they manifest from his Disabilities. District staff could have and should have implemented reasonable accommodations to address and reduce C.B.'s behaviors.  District staff should not have employed restraint and seclusion in the Seclusion Closet or cage.

56.   Among other things, defendants' conduct violates the Freedom from Unsafe Restraint and Seclusion Act statutes and regulations.

57.   The District discriminated against C.B. based on his Disabilities and denied him with an equal opportunity to participate in or benefit from the District's educational programs, violating the Americans with Disabilities Act and Section 504 of the Rehabilitation Act.

58.    Emboldened by an administration that supported and participated in the unlawful, unreasonable, and conscience shocking treatment of C.B., Mr. Bahret continued treating C.B. as described herein.

59.    Mr. Bahret increased his discriminatory treatment of C.B.

60.    Mr. Bahret refused to allow C.B. communicate with persons at school that he had formed a bond with.

61.    Mr. Bahret required C.B. to remain in soiled clothing for long periods.

62.    Mr. Bahret refused C.B. access to his iPad that his peers were allowed to have.

63.    Mr. Bahret denied C.B. access to food during lunchtime.

64.    Mr. Bahret disappeared with C.B. for great lengths of time to unknown locations and for unknown reasons.

65.    Defendants' treatment of C.B. as described herein is hereinafter collectively referred to as the "Treatment of C.B."  Defendants Treatment of C.B. was continuing, occurring at least throughout his 2022-2023 and 2023-2024 school years.

66.    This is not the first instance of Mr. Bahret's discriminatory conduct toward children with disabilities. District administration previously received complaints regarding Mr. Bahret's treatment of other disabled District students but nonetheless allowed Mr. Bahret to continue serving as C.B.'s paraprofessional.

67.    In or around November 2023, Jeff Bahner raised concerns to the District and Ms. Sanders after C.B. told his parents "Bert," "hit," "closet."  Mr. Bahner visited the school to see where Mr. Bahret had placed C.B. (i.e. the Seclusion Closet) and to advocate against C.B.'s discriminatory treatment by defendants and removal of Mr. Bahret as C.B.'s paraprofessional.

Ms. Sanders falsely informed Jeff that C.B. was placed into a different sensory room and allowed him to view the room.

68. Immediately thereafter, the District changed C.B.'s pickup and drop off times for school in a manner that made it very difficult for his parents to coordinate.

69. Jeff and Heather advocated for C.B.'s interests after C.B. alerted them as best he could to his treatment by defendants. At a subsequent Individualized Education Program ("IEP") Team Meeting convened pursuant to the Individuals with Disabilities Education Act, Jeff and Heather confronted District staff with their concerns regarding C.B.'s discriminatory treatment and placement. Jeff and Heather advocated against return of Mr. Bahret as C.B.'s paraprofessional.

70. Shortly after the IEP Team meeting, someone reported Jeff and Heather to the Kansas Department for Children and Families hotline, as suspected abusers and/or for purportedly neglecting C.B. Upon information and belief, the reporter was a District employee.

71. Defendants did not report any use of ESI toward C.B. pursuant to the Freedom from Unsafe Restraint Act.

72. Defendants never fully informed Heather of Jeff Bahner of their treatment of C.B. Plaintiffs began to discover defendants' unlawful conduct in or around May 2023 through other means.

73. Based on defendants' conduct and cover-up, discovery will likely uncover numerous additional unlawful restraints and seclusions of C.B. before and after August 2022. In which case, plaintiffs' claims may properly date back beyond August 2022.

74. The Treatment of C.B. was and is unreasonable. Indeed, no reasonable, trained administrator, special education teacher, or paraprofessional would treat any disabled student in

this manner.  And no reasonable, trained special education teacher or special education director

and administrator would support and ratify the conduct.

75.     And when Heather and Jeff Bahner advocated for C.B.'s rights under the IDEA,

Section 504, and/or the ADA, the District swiftly retaliated.

### C.B.'s Injuries and Damages

76.     Simply put, C.B.'s school experience is horrific.  Trivial behaviors manifesting from

his Disabilities such as refusing to follow instructions resulted in swift, punitive, and repeated

discriminatory Treatment of C.B. And sometimes C.B. experienced this treatment when

exhibiting no behaviors at all.

77.     Defendants' Treatment of C.B. has traumatized and emotionally damaged C.B.  C.B.

exhibits incredible anxiety and distress as a result of his treatment.  He rips his hair out, so much

so that he has large bald spots on his head.  C.B.'s atypical behaviors have markedly worsened,

and he now engages in increased instances of self-harm such as punching himself in the head.

C.B. quit using his words, and now just stands and drools.  He is terrified of the dark.  Despite

mostly appropriately toileting prior to defendants' Treatment of C.B., C.B. now defecates and

urinates in his clothes frequently.  C.B. refuses to leave his home out of fear.

78.     Defendants' Treatment of C.B. caused C.B.'s maladaptive behaviors to increase.

79.     As a direct result of defendants' conduct, C.B. has suffered past, present, and future

emotional distress, sadness, and anger.

80.     As a direct result of defendants' conduct, C.B. has also suffered past and future

economic losses.

### Administrative Exhaustion Not Required

81.   C.B.'s claims relate to disability discrimination for which there is no administrative exhaustion required under the IDEA.  Perez v. Sturgis Pub. Sch., 598 U.S. 142 (2023).

82.   C.B. tendered a Kansas Tort Claims Act notice to the District pursuant to K.S.A. § 12-105b on August 14, 2024.  C.B. will need to amend this Complaint to include any unresolved state law tort claims after expiration of 120 days.

### COUNT I: DISABILITY DISCRIMINATION
#### (SECTION 504, 29 U.S.C. § 794; ADA, 42 U.S.C. § 12132)
#### (C.B. vs. District)

83.   Plaintiffs incorporate by reference the allegations set forth above.

84.   Plaintiffs use the term "disability" and "handicapped" interchangeably herein.

85.   Section 504 of the of the Rehabilitation Act provides, in part, that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."  29 U.S.C. § 794(a); accord 42 U.S.C. § 12132.

86.   A "program or activity" is defined, in part, as all operations of a local educational agency.  Id. at § 794(b)(2).

87.   The term "individual with a disability" means "any person who has a disability as defined in section 3 of the Americans with Disabilities Act of 1990," 42 U.S.C. § 12102.  29 U.S.C. § 705(20).

88.   C.B. is an "individual with a disability" under Section 504 and the ADA.

89.   C.B.'s Disabilities constitute mental and physical impairments that substantially limit C.B.'s major life activities, including but not limited to learning, reading, concentrating, thinking, communicating, and digestive, neurological, and brain functions. There are records of such impairments contained within C.B.'s educational records.

90.     Defendants were aware of C.B.'s Disabilities, his limits and needs, and the effect they had on his academic abilities, performance, and development.  The District identified C.B. as having a disability that manifests with minor maladaptive behaviors and social-emotional deficits that do not pose an immediate danger of physical harm to C.B. or others.

91.     In the context of public secondary education, an "otherwise qualified" individual with a disability under Section 504 includes an individual with a disability (i) of an age during which non-disabled persons are provided such services, (ii) of any age during which it is mandatory under state law to provide such services to disabled persons, or (iii) to whom a state is required to provide a FAPE.  34 C.F.R. § 104.3(l).

92.     C.B. is an "otherwise qualified" individual with a disability under Section 504 and the ADA, and is entitled to participate in public school education offered by the District.

93.     The District receives federal financial assistance.

94.     To appropriately access public education and as reasonable accommodations of his Disabilities, C.B. requires and is entitled to general and specialized instruction and related services, including paraprofessional assistance, free from yelling and unlawful physical restraint, seclusions in the Seclusion Closet or cage, and battery.  C.B. requires and is entitled to access food at school, as well as access to school assistive technology such as an iPad.

95.     To appropriately access public education and as reasonable accommodations of his Disabilities, C.B. requires and is entitled to specialized instruction to teach C.B. strategies to reduce maladaptive behaviors, as well as coping and emotional regulation skills.

96.     To appropriately access public education and as a reasonable accommodation of his Disabilities, C.B. is required and is entitled to assistance with access to clean clothes after soiling his clothing.

97.   Without these and other accommodations of his Disabilities, C.B. has been and will be denied a public school education that is commensurate with his disabled and non-disabled peers.

98.   The District's Treatment of C.B. resulted in his exclusion from participation in District programs or activities receiving Federal financial assistance, and denial of the benefits associated with the same.  While C.B. was in the Seclusion Closet, the cage, being dragged elsewhere around school grounds, being denied his iPad or food, or in soiled clothing, C.B.'s peers were in the classroom enjoying the benefits of participating in the District's public school education programs.

99.   Defendants denied C.B. meaningful access to the services and benefits of public education offered by the school.  Defendants' Treatment of C.B. inhibited and continue to inhibit C.B.'s ability to meaningfully access and participate in the mainstream general education classroom and curriculum at a level commensurate with his disabled and non-disabled peers.

100.   No disabled child should have to endure the traumatic experience of being crammed into a dark Seclusion Closet or a locked cage, as C.B. experienced.

101.   And when Mr. or Ms. Bahner raised her concerns to District administrators, defendants' hid the truth.

102.   Moreover, the District doubled-down and continued the unlawful treatment of C.B., failing and refusing to make existing school services equally accessible to C.B. as a child with Disabilities.

103.   Defendants' conduct traumatized C.B. and exacerbated his atypical behaviors and social-emotional deficits.

104.   C.B.'s need for reasonable accommodations was obvious to defendants.  Yet defendants failed and refused to provide the same to C.B.

105.     Defendants' Treatment of C.B. constitutes intentional discrimination of C.B. based on and in relation to his disability, as demonstrated by direct evidence and/or inferred from defendants' deliberate indifference to the strong likelihood that pursuit of the District's policies will likely result in a violation of C.B.'s federally protected rights.

106.     The District discriminated against C.B. because of his disability by allowing, supporting, and attempting to hide Mr. Bahret's discriminatory treatment of C.B.

107.     Defendants knew that harm to C.B.'s federally protected rights was likely, and failed to act upon that likelihood.

108.     Defendants' failure to act was deliberate, as demonstrated by their campaign to keep the unlawful actions secret.

109.     Plaintiffs are entitled to recover their attorneys' fees pursuant to 42 U.S.C. § 12205 and/or 29 U.S.C. § 794a(b).

110.     As a direct and proximate cause of the District's violations of federal disability laws, C.B. has been damaged in numerous respects, including but not limited to potentially irremediable developmental delays, lost opportunity, and past and future economic losses entitling C.B. to compensatory damages in an amount to be proven at trial.

**COUNT II: 42 U.S.C. 1983**
**(Substantive Due Process: Fourteenth Amendment)**
**(C.B. v. all defendants)**

111.     Plaintiffs incorporate by reference the allegations set forth above.

112.     C.B. possesses Substantive Due Process liberty interests in bodily integrity and personal security, and in meaningful access to a free public education.

113.     Defendants Sanders, Hurla, and Bahret, acting under color of state law, were personally involved in violating C.B.'s constitutional rights in the Treatment of C.B. and/or approving, ratifying, covering up, and failing to intervene.

17

114.    Defendants' Treatment of C.B. was either in response to trivial behaviors that did not warrant use of ESI, or in response to no behaviors at all

115.    The District had an informal policy or custom and a well-settled, widespread, persistent pattern and practice of authorizing and ratifying District staff's unconstitutional Treatment of C.B. pursuant to the "how you have to handle him" and "tough love" policies.

116.    District officials with policymaking authority, including special services director Sarah Sanders, were notified about and had actual and constructive knowledge of, and decided to support and not stop the unconstitutional Treatment of C.B. by District staff subordinates to whom authority was delegated.

117.    Further, director Sanders ratified her decisions and the basis for such decisions regarding the Treatment of C.B.

118.    The Treatment of C.B. constitutes a substantial departure from accepted professional judgment.

119.    Alternatively, the District failed to train or supervise its employees regarding appropriate, lawful use of ESI, deliberately indifferent to the injuries that may and were caused to C.B.

120.    The District's policy or custom was the moving force behind C.B.'s deprivation of his substantive due process rights to bodily integrity and personal security and meaningful access to a free public education.

121.    The District acted with deliberate indifference.  District administrators and policymakers had actual and/or constructive notice that its actions and/or failures to act were substantially certain to result in a constitutional violation, and nonetheless consciously and deliberately chose to disregard that risk.

122.    The District knew that such failures caused C.B. to suffer deprivation of his rights to a public education and bodily integrity and personal security.

123.    The conduct of Ms. Sanders, Ms. Hurla, and Mr. Bahret violated clearly established constitutional and statutory rights that a reasonable person would have known. The unlawfulness of defendants' conduct was apparent in light of pre-existing law that defendants knew or should have known.

124.    The affirmative conduct of Ms. Hurla and Ms. Sanders, who both supervised Mr. Bahret, authorized the unlawful situation to persist and grow worse.  Not only did Ms. Hurla and Ms. Sander fail to intervene to cease the unlawful Treatment of C.B., they affirmatively acted to hide Mr. Bahret's conduct and/or discouraged District staff from reporting Mr. Bahret's conduct.

125.    Ms. Hurla and Ms. Sanders' conduct created an opportunity for Mr. Bahret to harm C.B., making C.B. more vulnerable and increasing his risk of harm.

126.    Neither Ms. Sanders, Ms. Hurla, or Mr. Bahret are entitled to qualified immunity as it relates to any of plaintiff's Constitutional claims.

127.    Ms. Sanders, Ms. Hurla, and Mr. Bahret's discriminatory conduct was malicious, willful, and in gross disregard of C.B.'s rights.  Accordingly, plaintiffs are entitled to punitive damages.

128.    Defendants' conduct was egregious, outrageous, brutal and inhumane, and disproportionate to the need presented, and directed at a disabled child of a vulnerable age. Defendants' conduct is conscience shocking.  Defendants' conduct violates C.B.'s substantive due process rights to bodily integrity and personal security.

129.    Plaintiffs are entitled to their attorneys' fees pursuant to 42 U.S.C. § 1988.

130.    As a direct and proximate cause of the defendants' violations of C.B.'s constitutional rights, C.B. has been damaged in numerous respects, including but not limited to potentially irremediable developmental delays and emotional distress, entitling C.B. to compensatory damages in an amount to be proven at trial.

### COUNT III: 42 U.S.C. 1983
### (Unreasonable Seizure:  Fourth Amendment)
### (C.B. v. All Defendants)

131.    Plaintiffs incorporate by reference the allegations set forth above.

132.    C.B. possesses rights under the Fourth Amendment to access public education free from the unreasonable seizures, including pulling, yanking, and tightening C.B.'s shirt collar and obstructing his airway; roughly pulling and placing C.B. in the dark Seclusion Closet; placing C.B. in a locked cage, and other Treatment of C.B. described herein.

133.    Defendants' conduct amounted to seizures of C.B. because the limitations of C.B.'s freedom of movement significantly exceeded that inherent in every-day, compulsory attendance.

134.    The restrictions imposed on C.B. removed him from his classroom environment.

135.    C.B. did not have the ability to remove Mr. Bahret's grasp, remove himself from the Seclusion Closet, or remove himself from the locked cage.

136.    Mr. Bahret's adult grasp of C.B.'s clothing functioned as a restraining mechanism that C.B. could not unbind himself from.

137.    Defendants' seizures of C.B. were not justified at their inception for at least the following reasons: (a) C.B. behaviors preceding his treatment by defendants were trivial, and the seizures were not reasonably necessary to discipline or control C.B., and (b) at least some seizures, including placement in the locking cage, were not responsive to any atypical behaviors by C.B. whatsoever.

138.    Assuming arguendo that one or more of C.B.'s seizures were justified at their inception, those same seizures were not reasonably related in scope to the circumstances which justified the interference in the first place.

139.    Defendants' Treatment of C.B. constitutes a substantial departure from accepted professional judgment, practice, or standards.  Indeed, defendants' conduct conflicts with the District's written policies and Kansas law.

140.    Defendants' seizures of C.B. were not reasonable.

141.    Defendants Sanders, Hurla, and Bahret, acting under color of state law, were personally involved in violating C.B.'s constitutional rights in the Treatment of C.B. and/or approving, ratifying, covering up, and failing to intervene.

142.    The District had an informal policy or custom and a well-settled, widespread, persistent pattern and practice of authorizing and ratifying District staff's unconstitutional Treatment of C.B. pursuant to the "how you have to handle him" and "tough love" policies.

143.    District officials with policymaking authority, including special services director Sarah Sanders, were notified about and had actual and constructive knowledge of, and decided to support and not stop the unconstitutional Treatment of C.B. by District staff subordinates to whom authority was delegated.

144.    Further, director Sanders ratified her decisions and the basis for such decisions regarding the Treatment of C.B.

145.    Alternatively, the District failed to train or supervise its employees regarding appropriate, lawful use of ESI, deliberately indifferent to the injuries that may and were caused to C.B.

146.    The District's policy or custom was the moving force behind C.B.'s deprivation of his substantive due process rights to bodily integrity and personal security.

147.    The District acted with deliberate indifference.  District administrators and policymakers had actual and/or constructive notice that its actions and/or failures to act were substantially certain to result in a constitutional violation, and nonetheless consciously and deliberately chose to disregard that risk.

148.    The District knew that such failures caused C.B. to suffer deprivation of his rights to a public education free from unreasonable seizures.

149.    The conduct of Ms. Sanders, Ms. Hurla, and Mr. Bahret violated clearly established constitutional and statutory rights that a reasonable person would have known. The unlawfulness of defendants' conduct was apparent in light of pre-existing law that defendants knew or should have known.

150.    The affirmative conduct of Ms. Hurla and Ms. Sanders, who both supervised Mr. Bahret, authorized the unlawful situation to persist and grow worse.  Not only did Ms. Hurla and Ms. Sander fail to intervene to cease the unlawful Treatment of C.B., they affirmatively acted to hide Mr. Bahret's conduct and/or discouraged District staff from reporting Mr. Bahret's conduct.

151.    Ms. Hurla and Ms. Sanders' conduct created an opportunity for Mr. Bahret to harm C.B., making C.B. more vulnerable and increasing his risk of harm.

152.    Neither Ms. Sanders, Ms. Hurla, or Mr. Bahret are entitled to qualified immunity as it relates to any of plaintiff's Constitutional claims.

153.    Ms. Sanders, Ms. Hurla, and Mr. Bahret's discriminatory conduct was malicious, willful, and in gross disregard of C.B.'s rights.  Accordingly, plaintiffs are entitled to punitive damages.

154.    Plaintiffs' are entitled to their attorneys' fees pursuant to 42 U.S.C. § 1988.

155.    As a direct and proximate cause of the defendants' violations of C.B.'s constitutional

rights, C.B. has been damaged in numerous respects, including but not limited to potentially

irremediable developmental delays and emotional distress, entitling C.B. to compensatory

damages in an amount to be proven at trial.

**COUNT IV: 42 U.S.C. 1983**
**(Equal Protection Clause: Fourteenth Amendment)**
**(C.B. v. District)**

156.    Plaintiffs incorporate by reference the allegations set forth above.

157.    C.B. possesses rights under Equal Protection Clause of the Fourth to equal access to

public education, free from the Treatment of C.B. described herein that was irrational and

abusive.

158.    C.B. may assert his equal protection claim as a "class of one."

159.    Defendants intentionally treated C.B. differently from other similarly situated disabled

students receiving special education services from the District.

160.    Similarly situated disabled students were not placed into the dark Seclusion Closet,

pulled and yanked by the shirt collar obstructing their airways, or placed in the locked cage.

161.    The difference in treatment of C.B. was without rational basis, was irrational and

abusive, and was wholly unrelated to any legitimate state activity.

162.    The District had an informal policy or custom and a well-settled, widespread,

persistent pattern and practice of authorizing and ratifying District staff's unconstitutional

Treatment of C.B. pursuant to the "how you have to handle him" and "tough love" policies.

163.    District officials with policymaking authority, including special services director Sarah

Sanders, were notified about and had actual and constructive knowledge of, and decided to

support and not stop the unconstitutional Treatment of C.B. by District staff subordinates to whom authority was delegated.

164.    Further, director Sanders ratified her decisions and the basis for such decisions regarding the Treatment of C.B.

165.    Alternatively, the District failed to train or supervise its employees regarding appropriate, lawful use of ESI, deliberately indifferent to the injuries that may and were caused to C.B.

166.    The District's policy or custom was the moving force behind C.B.'s deprivation of his substantive due process rights to bodily integrity and personal security.

167.    The District acted with deliberate indifference.  District administrators and policymakers had actual and/or constructive notice that its actions and/or failures to act were substantially certain to result in a constitutional violation, and nonetheless consciously and deliberately chose to disregard that risk.

168.    The District knew that such failures caused C.B. to suffer deprivation of his Equal Protection rights.

169.    Plaintiffs' are entitled to their attorneys' fees pursuant to 42 U.S.C. 1988.

170.    As a direct and proximate cause of the defendants' violations of C.B.'s constitutional rights, C.B. has been damaged in numerous respects, including but not limited to potentially irremediable developmental delays and emotional distress, entitling C.B. to compensatory damages in an amount to be proven at trial.

**COUNT V: RETALIATION**
**(SECTION 504, 29 U.S.C. § 794; ADA, 42 U.S.C. § 12132)**
**(Heather and Jeff Bahner v. District)**

171.    Plaintiffs incorporate by reference the allegations set forth above.

172.   Heather and Jeff Bahner engaged in the protected activity of advocating for C.B.'s IDEA rights.

173.   Heather and Jeff Bahner engaged in the protected activity of advocating against and complaining about the Treatment of C.B. based on his Disabilities, in violation of the ADA and Section 504.

174.   The District retaliated against the Bahners after they advocated for C.B.'s IDEA, ADA, and Section 504 rights, in at least the follow respects:

    a) The District changed C.B.'s transportation schedule, shortly after and in close temporal proximity to the Bahners' advocating for removal of Mr. Bahret as C.B.'s paraprofessional as a result of the Treatment of C.B. based on his Disabilities.

    b) Upon information and belief, a District employee reported false or misleading information to the Kansas Department of Children and Families ("DCF") regarding Heather and Jeff Bahner's treatment of C.B., shortly after and in close temporal proximity to the Bahners' advocating for continued removal of Mr. Bahret as C.B.'s paraprofessional as a result of the Treatment of C.B. based on his Disabilities.  The factual basis for this belief is the temporal proximity between plaintiffs' advocacy and the DCF report and prior retaliatory conduct by the District, that the report occurred while school was in session, and the demeanor of the DCF person investigating the report.

    c) The District refused to communicate with Jeff Bahner, and limited his access to school grounds, after Jeff advocated against the Treatment of C.B. based on his Disabilities and his rights under the IDEA, Section 504, and ADA rights;

    d) Mr. Bahret spread false and misleading rumors regarding plaintiffs, including claiming false injuries sustained by C.B., and that Jeff was violent;

    e) Mr. Bahret hid clean clothing meant for C.B. after he soiled his clothing. Further, Mr. Bahret trained C.B. to refer to Mr. Bahret as "daddy Bert."

    f) The District turned a blind eye toward the unlawful Treatment of C.B.

175.   Plaintiffs are entitled to recover their attorneys' fees pursuant to 42 U.S.C. 12205 and/or 29 U.S.C. 794a(b).

176.    As a direct and proximate cause of the District's unlawful retaliation, the Bahners have been damaged in numerous respects, including but not limited to lost wages and lost opportunity, entitling the Bahners to compensatory damages in an amount to be proven at trial.

### PRAYER FOR RELIEF

WHEREFORE, plaintiffs pray for the Court to enter judgment for plaintiffs' pecuniary and non-pecuniary compensatory damages, for punitive damages against the individual defendants, for their costs, for the attorneys' fees, and for any further relief as is just.

### <u>DESIGNATION OF PLACE OF TRIAL</u>

Plaintiff designates Kansas City, Kansas as the place of trial.

BARBER EMERSON, L.C.

By  <u>s/ Matthew J. Rogers</u>
Matthew J. Rogers, KS #27667
1211 Massachusetts St.
P.O. Box 667
Lawrence, KS  66044
Tele:  (785) 843-6600
Fax:  (785) 843-8405
mrogers@barberemerson.com
*Attorneys for Plaintiffs*

## DEMAND FOR JURY TRIAL

Plaintiff demands trial by jury on all issues so triable.

BARBER EMERSON, L.C.


By   s/ Matthew J. Rogers
     Matthew J. Rogers, KS #27667
     1211 Massachusetts St.
     P.O. Box 667
     Lawrence, KS  66044
     Tele:  (785) 843-6600
     Fax:  (785) 843-8405
     mrogers@barberemerson.com
     *Attorneys for Plaintiffs*