Rev. 12/29/2022

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

JEFF BAHNER and HEATHER BAHNER, )
individually, and as parents )
and next friends of minor C.B., )
                                  )
            Plaintiffs, )
                                  )   Case No. 24-cv-2361-HLT
v. )
                                    )
USD 321 KAW VALLEY, SARAH )
SANDERS, in her individual capacity, )
TAYLOR HURLA, in her individual capacity, )
and ALBERT BAHRET, in his individual )
capacity, )
                                    )
            Defendants. )
                                    )

## **PRETRIAL ORDER**

      On December 10, 2025, U.S. Magistrate Judge Teresa James conducted a pretrial conference in this case by videoconference. Plaintiffs Jeff Bahner and Heather Bahner, and C.B. appeared through counsel Matthew Rogers of Barber Emerson, L.C. Defendants Unified School District No. 321, Sarah Sanders, Taylor Hurla, and Albert Bahret appeared through counsel Alan Rupe and Kennedy Mayo of Lewis Brisbois Bisgaard & Smith LLP.

      This pretrial order supersedes all pleadings and controls the subsequent course of this case. It will not be modified except by consent of the parties and the court's approval, or by order of the court to prevent manifest injustice. *See* Fed. R. Civ. P. 16(d) & (e); D. Kan. Rule 16.2(a).

## 1.    PRELIMINARY MATTERS.

      **a.**    **Subject-Matter Jurisdiction.** Subject-matter jurisdiction is invoked under 28 U.S.C. §§ 1331 and 1367 and is not currently disputed.

      **b.**    **Personal Jurisdiction.**  The court's personal jurisdiction over the parties is not disputed.

      **c.**    **Venue.**  Venue in this court is not disputed.

      **d.**    **Governing Law.**  Subject to the court's determination of the law that applies to the case, the parties believe and agree that the substantive issues in this case are governed by the following law:

      The parties agree that the Americans with Disabilities Act as amended by the Americans with Disabilities Act Amendments Act, Section 504 of the Rehabilitation Act of 1973, as amended, and the Civil Rights Act of 1871, 42 U.S.C. § 1983, apply to plaintiffs' claims alleging violations of those federal laws.  The parties agree that the state law claims are governed by the law of the state of Kansas.

**2.**    **STIPULATIONS.**

      **a.**    The following facts are stipulated:

        i.    The following documents shall be deemed "authenticated" within the meaning of Fed. R. Evid. 901 without the need for any party to present evidence that such document is what it appears to be:  Bates labeled documents produced prior to October 31, 2025.

        ii.    C.B. has diagnoses of Down Syndrome, Dysphagia, Attention Deficit Hyperactive Disorder, developmental delay, speech delay, and Atrial Septal Defect.

        iii.    C.B. is an "individual with a disability" pursuant to the ADAAA and Section 504 of the Rehabilitation Act.

        iv.    USD 321 is a local education agency.

        v.    C.B. is an "otherwise qualified" individual with a disability under Section 504 and the ADA to participate in USD No. 321's educational programs during his 2022-2023 and 2023-2024 school years.

        vi.    USD 321 receives federal financial assistance.

      vii.     C.B. was a student enrolled at the St. Mary's Jr./Sr. High School within USD No. 321 during his 2022-2023 and 2023-2024 school years.

      viii.    Ms. Sarah Sanders, Ms. Taylor Hurla, and Mr. Albert Bahret are employees of USD No. 321 and were employed by USD No. 321 for the 2022-2023 school year and 2023-2024 school year.

      ix.     Ms. Sarah Sanders was the special education director at all relevant times.

      x.     Ms. Taylor Hurla was a special education teacher in the Learning Center at all relevant times.

      xi.     Ms. Shannon Kent was the special education assistant director at all relevant times.

      xii.    Mr. Kerry Lacock was superintendent at all relevant times.

      xiii.    Mr. Bahret was assigned to C.B. as his one-to-one paraprofessional when C.B. moved to the St. Mary's Jr./Sr. High School in 2021. Mr. Bahret remained as C.B.'s one-to-one paraprofessional until October 2023.

      xiv.    C.B. was placed in The Learning Center at Rossville Jr./Sr. High School, a classroom consisting solely of special education students.

**b.**    Absent any other instructions from the District Judge, the parties agree to meet and confer no later than 5 days before trial to attempt to reach agreement on and stipulate to the admissibility of additional exhibits for trial. At this time, the parties have stipulated to the foundation under Fed. R. Evid. 901 of the following exhibits for purposes of summary judgment and trial:

      i.     C.B.'s educational records produced in discovery, to include, but not limited to:

          1.    C.B.'s IEPs, BIPS, IEP Team meeting minutes, and/or notes regarding C.B.:

              a.    Deposition Exhibits 16, 17, 33, 41; and documents labeled D000852-868, D001169-1171, D000833-851, D001159-1161, D000869-892, D001157-1158, D000705-730, D000741-751, D006970-7001, D000016-35, D000693-701, D00702-704, D00785-787, D00796-797, D000894-919, D000920-938, D00941-942, D000944-948, D000952-954, D000968-970, D000975-999, D001057-1061, D001062-1067,

D001068-1073, D001100-1108, D001129-1134,
D001138-1146, D001147-1148, D001162-1163,
D001164-1168, D001216-1227, D001229-1234,
D002038-2039, D002066-2067, D002069-2072,
D002073-2077, D002126, D002129-2130, D002131,
D002146-2149, D002150

2. Video of C.B. (deposition exhibit 5)

3. Behavior data (deposition exhibits 8, 42, 69)

ii. Records pertaining to the September 26, 2023 event, including:

   i. Incident report (deposition exhibit 35, 64)

   ii. Iterations of the Incident Report (D002073-2077, D006467-6484; BAHNER_000648-672)

   iii. School Accident Report (deposition exhibit 21)

   iv. Eyewitness reports (deposition exhibit 32)

   v. Notes, statements, and communications (deposition exhibit 58, 63)

iii. Records pertaining to the storage area event (plaintiffs describe this event as the "cage event,") including:

   i. Photo of C.B. in storage area/storage cage (deposition exhibit 18)

   ii. August 19, 2024 report (deposition exhibit 72)

iv. District published policies, practices, handbooks, and training materials, produced in discovery to include, but not limited to:

   i. Policies GAAF, JCE, JGECA, KN (deposition exhibits 3, 29, 50-52)

   ii. Required staff and student trainings (deposition exhibit 49)

   iii. ESI PowerPoint (deposition exhibit 4)

   iv. Back to school training materials (deposition exhibits 25, 30, D002168-2171, D002225-2227, D002228-2229, D002230-2231)

   v. MAB Handbook (deposition exhibit 6)

   vi. Paraprofessional handbooks (deposition exhibits 7, 26)

   vii. Parent information (deposition exhibit 22)

       viii.   Defendant Bahret training records (deposition exhibits 31, 54-56)

v.  KSDE Amended Focused Monitoring Summary Report (deposition exhibit 9)

vi.  Floor plan of The Learning Center classroom (deposition exhibits 19, 20)

Documents Dr. Katrina Ostmeyer considered (OSTMEYER000020-000461; Bahner000411-612; D000581; D001197-1213; D002039, 2066-67, 2180; Bahner000405-410; Bahner000055, 64-66, 71-84, 90-92; D000008-10, 14, 16-20, 28-32, 34-35, 40-41, 1283-85, 1254-55, 1271-72, 1303, 1306-08, 1315, 1326-27, 2120-23, 5081-83, 5091, 5121, 5284-85, 6627-6632, 6792, 6801, 6813, 6833-34, 6837, 6849-6870, 6898-7001).

vii.  Text message communications between Taylor Hurla or Amy Bahm and Heather Bahner (BAHNER_000055, BAHNER_000056, BAHNER_000057, BAHNER_000058, BAHNER_000059, BAHNER_000060-63, BAHNER_000064-66, BAHNER_000067-70, BAHNER_000071-72, BAHNER_000073, BAHNER_000074-76, BAHNER_000077-80, BAHNER_000081, BAHNER_000082-84, BAHNER_000085, BAHNER_000086, BAHNER_000087-88, BAHNER_000089, BAHNER_000090-92, BAHNER_000093, BAHNER_000094-95, BAHNER_000096, D001236-1281, 1284-1285, D002127-2128, D002132-2133,).

viii.   E-mail communications between USD 321 employees and Heather Bahner.

ix.  Photographs of Room 809 (BAHNER_001107-001117).

x.  DCF Report submitted by Taylor Hurla.

xi.  All deposition exhibits.

xii.  Communications regarding transportation (D000007, D000042, D001243-1245, D001268-1271, D001274-1275, D001297-1301, D001317, D001321-1350, D001361-1364,D001738-1798, D001742-1774, D002068, D002106, D002119-2122, D002124-2125, and D002134-2144).

xiii.   C.B.'s medical records (SUB000001-12, SUB000013-994, SUB000997-1433.

xiv.   All written discovery responses.

3.    **FACTUAL CONTENTIONS.**

a.    **Plaintiffs' Factual Contentions.**

C.B. is an individual with a disability under Section 504 and the ADA, including the disabilities of Down Syndrome, Dysphagia, Attention Deficit Hyperactive Disorder, developmental delay, speech delay, and Atrial Septal Defect. At all pertinent times, one or more of C.B.'s disabilities constituted physical or mental impairments that limit one or more major life activities, and he was capable of performing the essential functions of his particular school programs with reasonable accommodation. During his 2022-2023 and 2023-2024 school years, C.B. attended St. Mary's Jr./Sr. High School, which is a school building that is part of and within defendant USD 321's boundaries. Defendant Bahret is an employee of USD 321 and was assigned as C.B.'s paraprofessional.

C.B.'s tenure as a District student was horrific. Multiple witnesses report that Mr. Bahret yelled aggressively at C.B.'s face on a daily basis, saying things like "Get up" or "I said . . ." Ms. Bahm reported her concerns regarding the same to two different special education teachers, one of whom is defendant Hurla. And Principal Adam Hurla witnessed one such yelling event in the hallway. The yelling did not cease after Ms. Bahm's report or Mr. Hurla's observation because no one intervened to stop it. Mr. Bahret placed C.B. in closets and dragged him from place to place. Mr. Bahret's conduct towards C.B. was very different from how other paraprofessionals worked with other USD 321 students with Down Syndrome who exhibited similar behaviors manifesting from their disabilities. Other students with Down Syndrome are not placed in closets, dragged by their paraprofessionals, or treated how Mr. Bahret treated C.B. Mr. Bahret adopted a "how you have to handle him" approach to C.B.

Multiple witnesses report serious, abusive conduct by Mr. Bahret towards C.B. during the 2022-2023 school year. Non-party witness Ms. DeLong observed Mr. Bahret pulling C.B. by his shirt collar across the classroom in a manner that upset her. Mr. Bahret pulled C.B. in a manner that caused C.B. to choke and struggle to breathe, a prohibited physical restraint. Ms. DeLong reported Mr. Bahret's conduct to the classroom teacher, and reported the conduct again to Ms. Hurla and Ms. Sanders during the pendency of the litigation. USD 321 did not initiate an investigation into this event, despite a USD 321 practice to investigate such allegations. Then, in or around May 2023 (and a second time on an undisclosed date) Mr. Bahret forced C.B. into a closet "Room 809" and secluded him therein as punishment for a non-threatening and non-physically aggressive disrobing behavior manifesting from C.B.'s disabilities. Room 809 is a storage closet used to store various items, is not designed or intended for use other than storage, and is smaller than regular classrooms. At the time Mr. Bahret secluded C.B. into Room 809 C.B. was regulated and clothed. Ms. Bahm reported the event to her superior, defendant Hurla, but no remedial steps were taken to correct or prevent Mr. Bahret's conduct.

C.B.'s 2023-2024 school year was no better. On September 1, 2023, in violation of the paraprofessional handbook, Mr. Bahret photographed C.B. locked in an equipment cage in the St. Mary's Jr./Sr. High School gymnasium. Mr. Bahret then disseminated the photograph in a text message that one witness reported compared C.B. to "the little monkey behind the bars." Ms. Bahm received the offensive text message, and felt the message was derogatory and making fun of C.B.'s disabilities. Then, on September 26, 2023, Mr. Bahret aggressively dragged C.B. by his shirt and arms and secluded him in the closet as punishment, in response to C.B.'s non-threatening and non-physically aggressive refusal

behavior.  Mr. Bahret was angry and yelled at C.B.  Although C.B. pleaded "Stop, Bert. Stop, Bert. Let me go," Mr. Bahret did not relent.  When Ms. Bahm asked what was going on, Mr. Bahret responded with something to the effect of "mind your business" or "stay in your lane."  Mr. Bahret hit C.B. while in the closet, as reported by C.B. to his father and again to school staff.  Nor did C.B.'s Individualized Education Plan call for C.B. to be removed or placed in closets.    When Mr. Bahner visited the school a few days later and asked to see the room Mr. Bahret had taken C.B. Ms. Sanders showed Mr. Bahner a different "sensory room," and not Room 809, misrepresenting the sensory room at as the location that Mr. Bahret had taken C.B. on September 26, 2023.

Shortly after Heather and Jeff Bahner complained about C.B.'s discriminatory treatment occurring on September 26, 2023 and requested removal of Mr. Bahret as C.B.'s paraprofessional, the District changed C.B.'s transportation schedule, requiring Ms. Bahner to drive more miles during pick-up/drop-off than she was before the change.  Mid-school year, during an Individualized Education Program ("IEP") meeting convened pursuant to the Individuals with Disabilities Education Act, the Bahners resisted requests from USD 321 to return Mr. Bahret as C.B.'s paraprofessional, because of Mr. Bahret's discriminatory treatment of C.B.  Then, on April 19, 2024 and in close temporal proximity to the Bahner's resistance, Ms. Hurla falsely reported suspected abuse and neglect of C.B. to the Kansas Department of Children and Families in retaliation for the Bahners' advocacy.  Ms. Hurla cited C.B.'s purported lack of hygiene and Ms. Bahner's failure to respond to emails asking for IEP revisions to address the same.  Yet Ms. Hurla did not express any such concern in her March 21, 2024 teacher interview regarding C.B.'s special education reevaluation, or at the IEP Team meeting convened on April 15, 2024.

Kansas regulations and school policy (policy GAAF) require USD 321 to train its staff annually on Emergency Safety Interventions ("ESI"). ESI means the use of seclusion or physical restraint by staff against a student, and must only be used where the "student presents a reasonable and immediate danger of physical harm to such student or others with the present ability to effect such physical harm." Annual ESI training must include training (consistent with nationally recognized training programs) regarding the use of positive behavioral intervention strategies, de-escalation techniques, and prevention techniques. Pursuant to USD 321 policy, each staff member must receive at least 1 hour of ESI training each year. In addition to the annual training requirements, USD 321 maintains a written procedural standard that requires certain staff, including Mr. Bahret, to maintain certification in the "Managing Aggressive Behaviors Training Program" ("MAB").

USD 321 has not complied with these regulatory and policy training requirements for years. Rather, USD 321 merely displays an annual 13-page PowerPoint presentation during a 10-20 minute training session involving numerous other topics to its staff. The PowerPoint presentation is not consistent with any nationally recognized training program, does not address prevention techniques, de-escalation techniques, or positive behavioral intervention strategies, and does not span the required 1-hour. Thus, defendants Hurla and Bahret, among other staff, did not participate in required ESI training. USD 321 does offer MAB occasionally – the only nationally recognized training program that teaches prevention techniques, de-escalation techniques, or positive behavioral intervention strategies – but it does not require its staff to participate or maintain their certification. Mr. Bahret's MAB certification lapsed in 2019. Moreover, Mr. Bahret submitted false training documents claiming training for hours that he was not even in the school building.

According to defendant Sanders, the Director of Special Services, although staff attend the back-to-school training every year, "[D]o they know what they're being trained on? No." Ms. Sanders signed off on Mr. Bahret's falsified training records without confirming his attendance and did not require that he recertify in MAB. Ms. Sanders acknowledged that the ESI annual PowerPoint (a presentation she co-presented) lasted only 10-20 minutes. Moreover, Mr. Bahret has used an ESI physical restraint (a "standing hold") at least four prior times on a different USD 321 student but did not report it as an ESI as required by Kansas regulations and USD 321 policies. Mr. Bahret does not know critical MAB principles like: (1) how much force is appropriate, or (2) reporting physical interventions. Nor is Mr. Bahret aware of when it is acceptable to use an emergency safety intervention, what constitutes a physical restraint, or things staff must consider prior to implementing a physical restraint or seclusion (such as positive behavior interventions). Physical restraint and seclusions are a last resort, narrowly used. But Mr. Bahret used restraint and seclusions, coupled with other inappropriate behavior (e.g. yelling), on a frequent basis inconsistent with ESI policies and regulations, MAB, and District policies and practices. Given his MAB certification lapse, both MAB and District policy did not even permit Mr. Bahret to grab or physically restrain any student.

C.B. began pulling out large clumps of his hair following the events in 2023, stopped using his words, began punching himself in the head, regressed in his toileting abilities, and regressed behaviorally – all of which evidence the emotional distress and trauma directly and proximately caused by defendants' conduct. Plaintiffs' retained expert, Dr. Ostmeyer, diagnosed C.B. with "Other Specified Trauma – and Stressor-Related Disorder, Persistent response to trauma with PTSD-like symptoms in an individual with a

developmentally-delayed presentation" arising from trauma due to the events occurring at school. Dr. Ostmeyer also diagnosed C.B. with Trichotillomania (Hair-Pulling Disorder). C.B. also has shirts that were damaged and torn during school hours, and takes medications to address his new anxiety symptoms following the 2023 events. Plaintiff C.B. has suffered emotional distress damages; future costs for his counseling, therapy, doctor care, and prescriptions; and damages with respect to his torn clothing and doctor visits. Plaintiffs Heather and Jeff Bahner suffered monetary losses associated with the increased mileage after the changed transportation schedule. Plaintiffs are entitled to punitive damages against the individual defendants and their attorneys' fees.

**b.   Defendants' Factual Contentions.**

Mr. Albert Bahret, a paraeducator at USD 321, started assisting as C.B.'s one-on-one paraeducator in 2018. According to many witnesses, Mr. Bahret and C.B. had a great relationship and C.B. behaved the best when C.B. was working with Mr. Bahret. Prior to working with Mr. Bahret, C.B. exhibited more behaviors, including struggling to keep his hands to himself, impulsivity, and anger issues, but his behaviors improved while working with Mr. Bahret. When Mr. Bahret was working with C.B., C.B. was not identified as a student who may need a physical restraint or seclusion, because C.B.'s behaviors had improved. Given the relative decrease in behaviors, Mr. Bahret was not identified as a paraeducator who needed Managing Aggressive Behaviors (MAB) training.

Nonetheless, Mr. Bahret did attend yearly back to school training, which included training on positive behavior supports, prevention techniques, and de-escalation techniques to avoid physical or aggressive behaviors from students. Mr. Bahret received training at the district wide event and training at the building level.

Ms. Bahm was a paraprofessional at USD 321 and at some point during C.B.'s educational career, Ms. Bahm and Mrs. Heather Bahner began to communicate regularly regarding C.B.   Until Ms. Bahner met Ms. Amy Bahm, Mrs. Bahner had no concerns regarding Mr. Bahret's treatment of or care for C.B.   In fact, prior to Ms. Bahm's allegations, Mrs. Bahner praised Mr. Bahret for his work with C.B.   Ms. Bahm would provide updates to Ms. Bahner regarding C.B.'s school day.   Over time, Ms. Bahm began reporting to Mrs. Bahner that Mr. Bahret was mistreating C.B.   After Mrs. Bahner was informed of a variety of allegations, largely via texts sent by Ms. Bahm, Mrs. Bahner did not contact the school to express any concerns.   For example, Mrs. Bahner admits that when she learned that Mr. Bahret had allegedly drug her son out of a classroom and restricted C.B.'s airway in the process, Ms. Bahner did not contact anyone at the school to address this concern.   Further, Ms. Bahm did not report these concerns to the special education teacher or administrators because she is "not one to complain."

Ms. Bahm is the only source for majority of Plaintiffs' claims, including that C.B. was placed in a closet in the dark on multiple occasions, C.B. was drug by his shirt to the point of being unable to breath, Mr. Bahret would throw away C.B.'s unfinished meal at the end of lunch, Mr. Bahret would allow C.B. to remain in soiled clothing, Mr. Bahret refused to allow C.B. to bring food to the classroom, Mr. Bahret hid C.B.'s clean clothes, Mr. Bahret did not allow C.B. to speak with Ms. Bahm, and  Mr. Bahret would unfairly limit C.B.'s access to his iPad.   No other educator or paraeducators witnessed these alleged actions.   The following example illustrates Ms. Bahm's inaccurate recollection and dramatization of events: Ms. Bahm asserted that from the beginning of working around Mr. Bahret and C.B., she noticed that Mr. Bahret would "yell."   Ms. Bahm admitted in her

deposition that using a loud voice was equivalent to yelling in her opinion and in reality, Mr. Bahret simply has a loud voice.  No other paraeducator or special education teacher witnessed Mr. Bahret yelling at C.B.  Further, no paraeducator or special education teacher stated that C.B. was treated with "tough love" nor was this euphemism used to describe how to work with C.B. Much of Plaintiffs' claims follow the same tale and are fundamentally flawed, because the claims rest almost exclusively on unreliable and uncorroborated testimony from Amy Bahm.  Ms. Bahm signed and notarized a declaration regarding the events she reported to Mrs. Bahner.  Ms. Bahm did not prepare her declaration and admits that portions of the declaration are completely false.  Ms. Bahm's declaration was prepared by Plaintiffs' counsel.

Ms. Bahm reported to Mrs. Bahner that C.B. was taken to Room 809 on two occasions.  Bahm reported to Mrs. Bahner that C.B. was improperly taken to Room 809 in approximately May 2023.  C.B. had disrobed, which is a common atypical behavior that C.B. displayed, and was placed in Room 809 to protect his dignity.  This is practice and procedure within USD 321.  If a student disrobes, then the goal is to find a place to allow the student to become dressed and regulated.

The second occasion was on September 26, 2023, after a tornado drill.  When returning from the tornado drill, C.B. became upset and C.B. cussed at another student, which is an atypical behavior C.B. regularly displays.  C.B. proceeded out of the classroom towards the kitchen and Mr. Bahret followed C.B.  When Mr. Bahret caught up to C.B., Mr. Bahret touched C.B. on the shoulder in hopes of getting C.B. to turn towards Mr. Bahret to communicate and de-escalate C.B.'s frustration.  When Mr. Bahret touched C.B.'s shoulder, C.B. turned around and kicked Mr. Bahret on the left side, then struck Mr.

Bahret on the right side of his face.  While C.B. was kicking Mr. Bahret, C.B. became off

balance, so Mr. Bahret held onto C.B. to try to sturdy him or at least break C.B.'s fall.  Mr.

Bahret and C.B. fell to the ground together.  Mr. Bahret stood up and waited for C.B. to

stand up from the floor.  When C.B. stood up, he guided Mr. Bahret by the arm to Room

809, which was a room C.B. previously used to calm down.  Mr. Bahret went to Room 809

with C.B. to allow C.B. to calm down.   While C.B. and Mr. Bahret were in Room 809,

paraeducator Ms. Sandra Howard went into Room 809 to check on C.B.  Ms. Howard

indicated that she saw C.B. and Mr. Bahret in the room with the light on.  Mr. Bahret was

trying to calm C.B. down with a soothing voice and reassuring C.B.  Ms. Howard did not

witness anything inappropriate in Room 809.

      After lunch, approximately 30 to 40 minutes after the incident, Mr. Bahret reported

the incident to special educator teacher Ms. Taylor Hurla.  At the time of the report, Ms.

Hurla did not believe anyone had been hurt and thought that C.B. had utilized the sensory

room to calm down, so Ms. Hurla did not request any reports or notes be prepared to

document the incident.  Later that day, Ms. Bahm texted Mrs. Bahner to inform her that

Mr. Bahret and C.B. engaged in a physical altercation and claimed C.B. was drug into

Room 809.  This report from Ms. Bahm prompted Mrs. Bahner to contact Ms. Hurla.  Ms.

Hurla spoke with Mr. Bahret the next day to get a better understanding of what transpired,

so that Ms. Hurla could provide a more detailed report to Mrs. Bahner.

      The text from Ms. Bahner to Ms. Hurla prompted an internal investigation led by

Special Education Director Ms. Sarah Sanders.  Mr. Bahret completed an incident report

and several other paraeducators completed eyewitness reports.   Then, Ms. Sanders

completed interviews with the paraeducators.  During the interviews, Ms. Sanders learned

that C.B. had hit Mr. Bahret.  Ms. Sanders ultimately concluded that the incident was not a restraint, because Mr. Bahret had his arms under C.B. to stop the fall – not to restrict C.B.'s movement.  Further, the use of Room 809 was not deemed a seclusion, because C.B. guided Mr. Bahret to that room, C.B. was accompanied by Mr. Bahret the entire time, the room was not locked, and C.B. was free to leave Room 809 on his own accord.

On Friday, September 29, 2023, Mr. Bahner appeared at the school, for the first time, to discuss some of his concerns.  When Mr. Bahner arrived he seemed very frustrated and he quickly approached Mr. Adam Hurla outside the school building.  When Mr. Bahner approached Mr. Hurla, he stated he needed to discuss C.B.'s classroom situation, so Mr. Hurla contacted Ms. Sarah Sanders, and Special Education Assistant Director, Ms. Shannon Kent to have them both attend the meeting with Mr. Bahner.  During the meeting Mr. Bahner stated that it was reported to him by C.B. that Mr. Bahret had hit C.B.  C.B. had stated "Bert" and "hit," which Mr. Bahner interpreted to mean Mr. Bahret hit C.B.  C.B. attended a portion of the meeting and was asked if he hit Mr. Bahret.  C.B. smiled and nodded his head yes, indicating that he hit Mr. Bahret.  Mr. Bahner also requested a tour of the Learning Center as he had never been to C.B.'s classroom, so Ms. Sanders and Ms. Kent provided Mr. Bahner a complete tour of the Learning Center.  At no point did Ms. Sanders or Ms. Kent indicate that the sensory room was the room that C.B. utilized on September 26, 2023.

After learning of the September 26, 2023, incident Mr. and Mrs. Bahner requested that Mr. Bahret no longer work with C.B despite USD 321 investigating and determining that Mr. Bahret had not acted improperly.  USD 321 immediately honored the request and sought to reassign Ms. Bahm as C.B.'s paraprofessional.  The Bahners specifically

requested that Ms. Bahm be C.B.'s paraprofessional. When Ms. Bahm learned that she would be assigned as C.B.'s paraprofessional, she claimed this was retaliation and voluntarily quit.

When Mr. Bahret was removed as C.B.'s paraeducator, the Bahners were informed that another paraeducator or educator would be designated as C.B.'s driver. At this time, the Bahners were informed that they needed to abide by the drop off and pick up times, which they had not previously done when Mr. Bahret was the driver. There were multiple occasions after this reminder that the Bahners failed to pick up C.B. on time and Mrs. Sanders or Ms. Kent would stay with C.B. until someone picked him up. On December 7, 2023, Mrs. Bahner contacted Ms. Kent and asked if C.B. could be picked up at the Bahners' home. USD 321 honored this request and began to pick up C.B. at home. USD 321 continued to ensure that C.B was dropped off at Casey's in the afternoon at Mrs. Bahner's request, because Mrs. Bahner commuted to and from Topeka for work.

Soon after Mr. Bahret was reassigned and C.B. was assigned to another paraeducator, C.B. became more volatile and became physical more often. C.B. began to punch himself in the face when he thought he was in trouble, and would curl into a ball if he thought he would be reprimanded. Ms. Hurla and fellow educators interpreted this to be signs of verbal abuse and potential physical abuse. Additionally, during the 2023-2024 school year, there were concerns regarding the level of care C.B. was receiving at home. C.B. would come to school in the same clothing multiple days in a row, C.B. had clearly not bathed, C.B.'s hair was matted with dirt, and appeared unbrushed. C.B. requires help with hygiene and has a fear of running water, so he is unable to maintain his hygiene without assistance, which was seemingly not being provided at home. The increased

behaviors, physical threats, signs of abuse, lack of hygiene, unhealthy diet, and failure to pick up C.B. timely or notify any educator of the delay to pick up C.B. led Ms. Hurla to reasonably believe that C.B. was being neglected. Ms. Hurla submitted a report to the Kansas Department of Children and Families out of valid concern for C.B., which the Bahners have twisted into a retaliation claim.

During the course of the lawsuit, it came to light that Ms. Stephanie DeLong, another paraeducator, reported an event to an unknown teacher on an unknown date regarding an interaction between C.B. and Mr. Bahret. Ms. DeLong stated that she turned around in the classroom one day to see Mr. Bahret pulling C.B. from the classroom by his shirt. Ms. DeLong did not witness what occurred to cause Mr. Bahret to escort C.B. out of the room. Mr. Bahret believes that Ms. DeLong is referring to an event in which C.B. was digging his nails into another teacher, Mr. Dorian Sills-Berry, then Mr. Bahret removed C.B.'s hands from Mr. Sills-Berry and escorted C.B. out of the room. Since Ms. DeLong's report to an unknown teacher, she has not witnessed any other behavior between C.B. and Mr. Bahret that she has found to be inappropriate or hostile. Ms. DeLong reported what she witnessed to Ms. Hurla, Ms. Sanders, and Ms. Kent for the first time during the course of the lawsuit. Additionally, Ms. DeLong disputes Ms. Bahm's statements in her declaration regarding the incident Ms. DeLong witnessed. Ms. DeLong does not remember C.B. being choked or coughing as Ms. Bahm claims, and Ms. DeLong would recall if that had occurred.

In November 2023, right after the alleged incident in which Mr. Bahret hit C.B., C.B.'s doctors and mother noted that C.B. was doing well in school and was experiencing no anxiety or depression. In February 2024, Mrs. Bahner reported to C.B.'s doctor that she

believed C.B. was doing well overall.  Mrs. Bahner noted that she did not observe any concerning changes in mood.  Then suddenly in August 2024, approximately three days after filing this lawsuit, Mrs. Bahner reported to C.B.'s doctor that she felt like C.B. was experiencing more anxiety.  Mrs. Bahner relayed to the doctor that the Bahners were pursuing a lawsuit against Defendants and believed that C.B. had regressed over the prior 12-18 months.

Plaintiffs' retained expert Dr. Katrina Ostmeyer to opine on C.B.'s psychological and emotional condition.  Dr. Ostmeyer did not observe or interview C.B. nor did she interview any educators or paraeducators who worked with C.B.  To form her opinion, Dr. Ostmeyer relied on the statements and information provided by Jeff and Heather Bahner and medical records, which include information and narratives largely supplied by the Bahners.  Dr. Ostmeyer also largely relied on Ms. Amy Bahm's declaration, which Ms. Bahm admits includes false or inaccurate information.  Plaintiffs utilize Dr. Ostmeyer's opinion to justify their speculative emotional distress damages and future medical care damages.  Plaintiffs provide no justification or reasoning for their $25,000,000 emotional distress damages or $2,000,000 future medical care damages.

4.    **LEGAL CLAIMS AND DEFENSES.**

a.    **Plaintiffs' Claims.**

Plaintiffs assert that they are entitled to recover upon the following theories:

i.    **Disability Discrimination (C.B. v. District) (Count I).** Defendant USD 321 intentionally discriminated against C.B. on the basis of his disability as demonstrated by direct evidence and/or inferred from defendants' deliberate indifference to the strong likelihood that pursuit of the District's policies will likely result in a violation of C.B.'s federally protected rights, excluded him from participation in its programs or activities, and denied C.B. the benefits of its programs or activities, by Mr. Bahret's and other USD 321 employees' treatment of C.B., allowing and failing to intervene to stop the

same, and failing to train and supervise its employees, in violation of the Americans with Disabilities Act, as amended, and Section 504 of the Rehabilitation Act.

ii.  **42 U.S.C. § 1983 – Substantive Due Process – 14th Am. (C.B. v. All Defendants) (Count II).** Defendant Bahret acting under the color of state law, violated C.B.'s Substantive Due Process liberty interests in bodily integrity and personal security based on his treatment of C.B. (e.g. dragging, choking, hitting, placing C.B. in a closet). Defendants Hurla and Sanders acting under the color of state law increased C.B.'s obvious risk of harm by failing to intervene and affirmatively acting to hide Mr. Bahret's treatment of C.B., thereby creating an opportunity for Mr. Bahret to harm C.B., in violation of his Substantive Due Process liberty interests in bodily integrity and personal security.  USD 321 is liable under this Section 1983 claim because it had policy or customs that directly caused C.B.'s injuries, including (a) an informal custom to treat C.B. in a "how you have to handle him" manner amounting to widespread practice; (b) ratification by final policymakers Adam Hurla and Sarah Sanders of Mr. Bahret's conduct; and, (c) deliberate indifference to its failure to adequately train or supervise its employees with respect to emergency safety interventions, positive behavioral interventions, de-escalation techniques, and prevention techniques, reporting staff misconduct, and treatment of C.B.

iii.  **42 U.S.C. § 1983 – Unreasonable Seizure – 4th Am. (C.B. v. All Defendants) (Count III).** Defendant Bahret acting under the color of state law, violated C.B.'s Fourth Amendment rights to be free from unreasonable seizures placing limitations on C.B.'s freedom of movement significantly exceeding that inherent in every-day, compulsory attendance, based on his treatment of C.B. (e.g. dragging, choking, hitting, placing C.B. in a closet). The seizures were not justified at their inception and/or not reasonably related in scope to the circumstances which justified the interference in the first place.  Defendants Hurla and Sanders acting under the color of state law increased C.B.'s obvious risk of harm by failing to intervene and affirmatively acting to hide Mr. Bahret's treatment of C.B., thereby creating an opportunity for Mr. Bahret to harm C.B., in violation of his Fourth Amendment right to be free from unreasonable seizures.  USD 321 is liable under this Section 1983 claim because it had policy or customs that directly caused C.B.'s injuries, including (a) an informal custom to treat C.B. in a "how you have to handle him" manner amounting to widespread practice; (b) ratification by final policymakers Adam Hurla and Sarah Sanders of Mr. Bahret's conduct; and (c) deliberate indifference to its failure to adequately train or supervise its employees with respect to emergency safety interventions, positive behavioral interventions, de-escalation techniques, and prevention techniques, reporting staff misconduct, and treatment of C.B.

iv.    **42 U.S.C. § 1983 – Equal Protection Clause – 14ᵗʰ Am. (C.B. v. District) (Count IV).** Defendant Bahret acting under the color of state law, violated C.B.'s Equal Protection rights to equal access to public education, free from Mr. Bahret's treatment of C.B. (e.g. dragging, choking, hitting, placing C.B. in a closet), which was different treatment than other similarly situated disabled students in USD 321 received. Defendants Hurla and Sanders acting under the color of state law increased C.B.'s obvious risk of harm by failing to intervene and affirmatively acting to hide Mr. Bahret's treatment of C.B., thereby creating an opportunity for Mr. Bahret to harm C.B., in violation of his Equal Protection rights to equal access to public education. USD 321 is liable under this Section 1983 claim because it had policy or customs that directly caused C.B.'s injuries, including (a) an informal custom to treat C.B. in a "how you have to handle him" manner amounting to widespread practice; (b) ratification by final policymakers Adam Hurla and Sarah Sanders of Mr. Bahret's conduct; and,(c) deliberate indifference to its failure to adequately train or supervise its employees with respect to emergency safety interventions, positive behavioral interventions, de-escalation techniques, and prevention techniques, reporting staff misconduct, and treatment of C.B.

v.    **Retaliation (Jeff and Heather Bahner v. District) (Count V).** USD 321 retaliated against Heather Bahner and Jeff Bahner for engaging in the protected activity of advocating for C.B.'s IDEA, ADA, and Section 504 rights and against Mr. Bahret's discriminatory treatment of C.B. by (a) changing C.B.'s transportation schedule, and (b) falsely and maliciously reporting suspected abuse and neglect of C.B. to the Kansas Department of Children and Families, in violation of the Americans with Disabilities Act, as amended, and Section 504 of the Rehabilitation Act.

vi.    **Intentional Infliction of Emotional Distress (C.B. v. District and Mr. Bahret) (Count VI).** Defendants Bahret and USD 321 intentionally inflicted emotional distress on C.B. by Mr. Bahret's treatment of C.B. (e.g. dragging, choking, hitting, placing C.B. in a closet).

vii.   **Negligence (C.B. v. District) (Count VII).** Defendant USD 321 negligently breached its duties of reasonable care under the circumstances, in that defendant failed to (a) protect C.B. from being physically and emotionally harmed by USD 321 employee Mr. Bahret and failing to intervene to stop it; (b) supervise and train its staff, including defendants Bahret, Sanders, and Hurla, with respect to emergency safety interventions, positive behavioral interventions, de-escalation techniques, and prevention techniques, reporting staff misconduct, and treatment of C.B.; and (c) retaining Mr. Bahret after it was on notice of his conduct.

viii.  **Battery (C.B. v. District and Mr. Bahret) (Count VIII).** Defendants USD 321 and Bahret are liable for battery of C.B. by Mr. Bahret's treatment of C.B. (e.g. dragging, choking, and hitting C.B.).

ix.    **False Imprisonment (C.B. v. District and Mr. Bahret) (Count IX).**
Defendants USD 321 and Bahret are liable for C.B.'s false imprisonment of
C.B. by Mr. Bahret's treatment of C.B. (e.g. grabbing, restraining,
placement in closet).

**b.    Defendants' Defenses.**

Defendants assert the following defenses:

i.    Plaintiffs fail to state a claim upon which relief can be granted

ii.    The Court lacks subject matter jurisdiction over all, or part of Plaintiffs'
claims.

iii.    Defendants owed no duty to Plaintiffs which has alleged to have been
breached.

iv.    Defendant USD No. 321 denies that any of its employees or agents, acting
within the course and scope of their agency or employment, violated any
duty owed to or caused any damage or injury to Plaintiffs.

v.    Defendant USD 321 has no municipal policy or custom which violates the
rights of Plaintiffs.

vi.    Plaintiffs have failed to sufficiently plead grounds for municipal liability
against Defendant USD No. 321.

vii.    Defendant USD No. 321 has no *respondeat superior* liability for the acts or
omissions of any of its employees.

viii.    Plaintiffs have failed to mitigate their damages, if any.

ix.    Plaintiffs' damages, if any, are limited, in whole or in part, by the Civil
Rights Act of 1991 (42 U.S.C. § 1981a).

x.    All applicable statutory caps for damages limit any damages alleged to have
been suffered or incurred by Plaintiffs, the existence of such damages
Defendants specifically deny.

xi.    The damages sought by Plaintiffs are based on speculation and are therefore
not recoverable against Defendants.

xii.    Plaintiffs' claims for equitable relief, if any, are barred, in whole or in part,
by the existence of an adequate remedy at law and are moot.

xiii.    Plaintiffs' claims are barred or reduced, in whole or in part, by the Kansas
Tort Claims Act, K.S.A. 70-6101, *et seq.*

xiv.    Defendants Sanders, Hurla, and Bahret, in their individual capacities, are entitled to qualified immunity protections against Plaintiffs' claims.

xv.    Plaintiffs' claims are barred, in whole or in part, for Plaintiffs' failure to exhaust administrative remedies.

xvi.    Plaintiffs' claims against USD 321 are barred by the doctrine of preclusion or preemption.

xvii.    Defendant USD No. 321 is not subject to vicarious liability under § 1983.

xviii.    Defendants, at all times, acted rationally, reasonably, and in good faith, without fraud, malice, or improper intent, and for legitimate reasons.

xix.    Plaintiffs' claims for punitive damages against Defendants Sanders, Hurla, and Bahret are barred or limited in whole or in part because Plaintiffs have not alleged egregious conduct necessary for punitive damages under the statutes cited.

xx.    Plaintiffs' claims for punitive damages are disproportionate to the injuries suffered, if any, and violate the excessive fines clause of the Eighth Amendment and due process clause of the Fourteenth Amendment to the U.S. Constitution.

xxi.    Plaintiffs' claims for punitive damages are limited to the extent they violate Defendants' constitutional rights under Article I, Section 8 and the Fifth, Sixth, Eighth, and Fourteenth Amendment to the U.S. Constitution.

xxii.    Plaintiffs' claims against the individual Defendant USD No. 321 are barred by the Coverdell Act, 20 U.S.C. § 6736(a).

xxiii.    Plaintiffs' claims are barred by K.S.A. 38-2223(f).

xxiv.    This action is frivolous and insubstantial having been filed without probable cause or reasonable investigation entitling Defendants to their costs, including reasonable attorneys' fees, incurred in defending this action.

xxv.    Plaintiffs' Equal Protection claim is a class of one claim, which is not suitable in the public education setting. *Mueting v. Unified Sch. Dist. No. 443, et al.*, Case No. 2:24-cv-02381-HLT-BGS2025, U.S. Dist. LEXIS 86098, at * 15 (D. Kan. May 6, 2025). [1]

---

[1] Plaintiffs object to the inclusion of the defenses in paragraphs 4.b.xxv–xxvii of the Pretrial Order as not previously pled or otherwise disclosed by Defendants but Defendants argue these

xxvi.   Plaintiffs' claim for punitive damages fail to state a claim, because they are unavailable as causes of action in this context. *See City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247 (1981) (explaining punitive damages are unavailable to plaintiffs suing municipalities under Section 1983); *Hamer v. City of Trinidad*, 924 F.3d 1093, 1109 (10th Cir. 2019).

xxvii.  Plaintiffs' claims for emotional distress damages are subject to the United States Supreme Court's opinion in *Cummings v. Premier Rehab Keller, P.L.L.C.*, 142 S. Ct. 1562, 1568 (2022) and therefore they are unavailable and fail to state a claim.

## 5.    DAMAGES AND NON-MONETARY RELIEF REQUESTED.

a)  ADAAA and Section 504 Discrimination (Count I, by C.B. against defendant USD 321)

   i.     Future pecuniary loss for counseling, therapy, doctor care and well checks, and prescriptions: $2,000,000

   ii.    Doctor visits and prescription costs: $2,928.68

   iii.   T-shirts: $60

   iv.    Attorneys' fees, which are currently estimated to be $162,749.50 and costs, which are currently estimated to be $24,746.36 pursuant to 42 U.S.C. § 12205, 29 U.S.C. § 794a(b).

b)  Section 1983 – Substantive Due Process, Fourth Amendment Unreasonable Seizure, and Equal Protect Clause (Counts II and III, C.B. against defendants USD 321, Bahret, Hurla, and Sanders) (Count III, C.B. against defendant USD 321)

   i.     Emotional Distress: $25,000,000

   ii.    Future pecuniary loss for counseling, therapy, doctor care and well checks, and prescriptions: $2,000,000

   iii.   Doctor visits and prescription costs: $2,928.68

   iv.    T-shirts: $60

   v.     Attorneys' fees, which are currently estimated to be $162,749.50, and costs, which are currently estimated to be $24,746.36 pursuant to 42 U.S.C. § 1988.

---

defenses are subsumed or fall within the failure to state a claim and denial of damages affirmative defenses.

        vi.      Punitive damages (against defendants Bahret, Hurla, and Sanders) in an amount to be determined by the jury.

c) ADAAA and Section 504 Retaliation (Count V, Heather Bahner and Jeff Bahner against defendant USD 321)

        i.      Mileage for changed transportation schedule: $693 (46.2 miles x 90 days x $0.67 per mile)

        ii.      Attorneys' fees, which are currently estimated to be $162,749.50, and costs, which are currently estimated to be $24,746.36 pursuant to 42 U.S.C. § 12205, 29 U.S.C. § 794a(b).

d) Intentional Infliction of Emotional Distress (Count VI, C.B. against defendants USD 321 and Mr. Bahret)

        i.      Emotional Distress: $25,000,000

        ii.      Future pecuniary loss for counseling, therapy, doctor care and well checks, and prescriptions: $2,000,000

        iii.      Doctor visits and prescription costs: $2,928.68

        iv.      T-shirts: $60

        v.      Punitive damages (against defendant Bahret) in an amount to be determined by the jury.

e) Negligence (Count VII, C.B. against defendant USD 321)

        i.      Future pecuniary loss for counseling, therapy, doctor care and well checks, and prescriptions: $2,000,000

        ii.      Doctor visits and prescription costs: $2,928.68

        iii.      T-shirts: $60

f) Battery and False Imprisonment (Counts VIII, IX, C.B. against defendants USD 321 and Bahret)

        i.      Future pecuniary loss for counseling, therapy, doctor care and well checks, and prescriptions: $2,000,000

        ii.      Doctor visits and prescription costs: $2,928.68

        iii.      T-shirts: $60

        iv.      Punitive damages (against defendant Bahret) in an amount to be determined by the jury.

**6.     AMENDMENTS TO PLEADINGS.,**

None.

**7.     DISCOVERY.**

Under the scheduling order and any amendments, all discovery was to have been completed by October 6, 2025.  Discovery is complete.  However, the parties agreed that defendants will promptly produce Ms. Sanders, Ms. Hurla, and Mr. Bahret's 2023 and 2024 tax returns if one or more of these defendants remain as parties to the case following the Court's ruling on summary judgment.  Further, the parties agree that plaintiffs' request for attorneys' fees and costs is a matter for post-judgment briefing.  If plaintiffs prevail, plaintiffs agree to provide defendants with billing records evidencing their attorneys' fees and costs.

Unopposed discovery may continue after the deadline to complete discovery so long as it does not delay briefing or ruling on dispositive motions or other pretrial preparations.  Although discovery may be conducted beyond the deadline to complete discovery if all parties agree to do so, under these circumstances the court will not be available to resolve any disputes that arise during the course of such extended discovery.

**8.     MOTIONS.**

**a.     Pending Motions.**

None.

**b.     Additional Pretrial Motions.**

After the pretrial conference, the parties intend to file the following motions:

   i.     Motions in Limine

   ii.    Motions for Summary Judgment

   iii.   Motions to Exclude Expert Testimony

The dispositive-motion deadline, as established in the scheduling order and any amendments, is extended to **January 9, 2026**. Plaintiffs' deadline to file a response is extended to **February 9, 2026**. Defendants' deadline to file a reply brief is extended to **February 27, 2026**. Further requests for extensions of these deadlines may result in the trial date being continued.

The parties should follow the summary-judgment guidelines on the court's website:

https://ksd.uscourts.gov/sites/ksd/files/Summary-Judgment-Guidelines%202023.pdf

Principal briefs in support of, or in response to, summary judgment motions must not exceed 40 pages and replies must not exceed 15 pages. *See* D. KAN. RULE 7.1(d)(2). Any motion to exceed these page limits or for an extension of briefing deadlines must be filed at least three days before the brief's filing deadline. *See* D. KAN. RULE 6.1(a), 7.1(d)(4).

**Motions Regarding Expert Testimony.** All motions to exclude the testimony of expert witnesses pursuant to Fed. R. Evid. 702-705, *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), or similar case law, must be filed by **January 9, 2026**. Plaintiffs' deadline to file a response is extended to **February 9, 2026**. Defendants' deadline to file a reply brief is extended to **February 27, 2026**. Further requests for extensions of these deadlines may result in the trial date being continued.

9.    **TRIAL.**

This case is set for jury trial before District Judge Holly L. Teeter beginning on **<u>September 21, 2026, at 9:00 a.m.,</u> in Kansas City, Kansas in Courtroom 463**. Trial is expected to take approximately **5-7 days**. The court will attempt to decide any timely filed dispositive motions approximately 60 days before trial. If no dispositive motions are timely filed, or if the case remains at issue after timely dispositive motions have been decided, then the trial judge may enter an order or convene another pretrial conference to set deadlines for filing final witness and exhibit

disclosures, exchanging and marking trial exhibits, designating deposition testimony for presentation at trial, motions in limine, proposed instructions in jury trials, and proposed findings of fact and conclusions of law in bench trials.

**10.    ALTERNATIVE DISPUTE RESOLUTION (ADR).**

The status of settlement negotiations is as follows: The parties participated in an unsuccessful mediation on April 29, 2025. The parties currently believe the prospects for settlement of this case are fair and they do not believe that further court-ordered ADR would be helpful. The parties are discussing the possibility of using mediator Jay Daugherty for a second mediation but the timing has not been decided.

The parties are reminded that, under D. Kan. Rule 40.3, they must immediately notify the court if they reach an agreement that resolves the litigation as to any or all parties. Jury costs may be assessed under this rule if the parties do not provide notice of settlement to the court's jury coordinator at least one full business day before the scheduled trial date.

IT IS SO ORDERED.

Dated December 19, 2025, at Kansas City, Kansas.

Teresa J. James
U. S. Magistrate Judge

Submitted and approved by:

/s/ Alan L. Rupe
Alan L. Rupe, KS #08914
Kennedy Mayo, KS #30404
LEWIS BRISBOIS BISGAARD
  & SMITH LLP
1605 N. Waterfront Parkway, Suite 150
Wichita, KS 67206
Telephone: (316) 609-7900
Facsimile:  (316) 462-5746
alan.rupe@lewisbrisbois.com
kennedy.mayo@lewisbrisbois.com

*Attorney for Defendant USD 321 Kaw Valley,
Sarah Sanders, Taylor Hurla, and Albert Bahret*

/s/ Matthew J. Rogers (w/consent)
Matthew J. Rogers, KS #27667
BARBER EMERSON, L.C.
1211 Massachusetts St.
P.O. BOX 667
Lawrence, KS 66044
Telephone:  (785) 843-6600
Facsimile:  (785) 843-8405
mrogers@barberemerson.com

*Attorneys for Plaintiff*